UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ROEL OLMEDO,<br><br>                    Plaintiff,<br><br>        v.<br><br>SKY CLIMBER WIND SOLUTIONS LLC,<br><br>                    Defendant. | CASE NO. 3:24-cv-05303-DGE<br><br>ORDER GRANTING MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION (DKT. NO. 53) |

## I        INTRODUCTION

Before the Court is Plaintiff's Motion to Conditionally Certify a Collective Action under Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and to authorize notice.  (Dkt. No. 53.)  For the reasons that follow, the motion is GRANTED as to conditional certification.  The Court will direct the parties to meet and confer to finalize terms of the notice before granting final authorization.

1

## II     BACKGROUND

2      Defendant Sky Climber Wind Solutions LLC ("Sky Climber") "provides wind turbine

3  maintenance, repair, and inspection services to the wind energy industry."  (Dkt. No. 54 at 8.)

4  Defendant is incorporated and based in Ohio.  (*Id.*)  Plaintiff Roel Olmedo was employed by Sky

5  Climber as a Wind Technician from approximately August 2021 to September 2022, and worked

6  for Sky Climber at locations in Iowa, Texas, and Washington.  (Dkt. No. 53-1 at 2–3.)  Mr.

7  Olmedo's "daily duties included climbing wind turbines and replacing wind turbine blade

8  cables."  (*Id.* at 3.)  He was paid on an hourly basis.  (*Id.*)

9      Mr. Olmedo alleges that Sky Climber failed to pay him wages to which he was entitled,

10  in violation of the FLSA, in two primary ways.  One, he alleges that Sky Climber had a policy of

11  requiring workers to deduct a thirty-minute meal break from their daily hours (the "meal break

12  policy") but in practice pressured workers to work through that time.  (Dkt. No. 53 at 4–5.)

13  Supervisors would not accept a timesheet that excluded the thirty-minute break, and those who

14  failed to include the deduction could "get in trouble."  (*Id.* at 5.)  Plaintiff estimates that at the

15  average hourly rate of $23.00, this amounted to $344 to $412 of lost wages per month.  (*Id.* at 6.)

16  Two, Sky Climber awarded non-discretionary bonuses for employees who met certain

17  production targets but did not include that amount in the calculation of employees' regular rate

18  of pay, which deflated the employees' overtime pay (i.e., the "bonus pay scheme").  (*See id.*); *see*

19  29 C.F.R. § 778.208 (requiring inclusion of non-discretionary bonuses in calculation of regular

20  rate of pay.  Mr. Olmedo moves to certify a collective action on behalf of himself and other Sky

21  Climber employees similarly situated under Section 16(b) of the FLSA.  (Dkt. No. 53 at 1.)

22      Defendant denies that it pressures employees to work through their meal breaks, and to

23  the contrary it requires employees to take thirty-minute unpaid meal breaks and other paid breaks

24

1   "to reduce fatigue and attendant risks."  (Dkt. No. 54 at 13.)  If for some reason an employee

2   misses their meal break they are "instructed to add 30 minutes to their time at the end of the day

3   so they are paid for the missed break."  (*Id.* at 17.)  Defendant argues that its meal break policy

4   does not violate the FLSA, and that Plaintiff's putative class members are not similarly situated

5   with respect to the meal break policy, because they have different roles and working conditions.

6   (*See id.* at 22–28.)  As discussed below, however, Defendant concedes that certification is

7   appropriate as to the bonus pay scheme group, with some qualifications.  (*Id.* at 8.)  Defendant

8   also opposes certain aspects of Plaintiff's proposed notice terms and distribution methods.  (*Id.* at

9   31–33.)

10

11                          **III     DISCUSSION**

12          a.  Uncontested Claims

13          Over the course of briefing, the Parties' dispute has narrowed significantly.  For one,

14   Defendant does not oppose certification of a collective action on the bonus pay scheme to the

15   extent it is limited to plaintiffs who *received* an incentive bonus and who worked in Washington.

16   (Dkt. No. 54 at 8.)  On reply, Plaintiff does not offer any argument against these limitations to

17   the bonus pay scheme group, so the Court will treat this issue as agreed upon.  (*See* Dkt. No. 57

18   at 3, n.3.)

19          The Parties also appear to have a common understanding as to jurisdiction, for now.

20   Defendant argues that this Court lacks jurisdiction as to putative plaintiffs outside Washington.

21   (Dkt. No. 54 at 19.)  Defendant relies on other cases in this District holding that the Supreme

22   Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. 255

23   (2017) ("*Bristol-Myers*") applies to collective actions under the FLSA, and jurisdiction is

24

therefore limited to in-state plaintiffs.  *See McNutt v. Swift Transport. Co. of Ariz., LLC*, Case No. C18-5668 BHS, 2020 WL 3819239 at *8 (W.D. Wash. July 7, 2020); *Roberts v. Sidwell Air Freight Inc.*, No. C21-5912 BHS, 2022 WL 16949565, at *5 (W.D. Wash. Nov. 15, 2022); *Carlson v. United Nat. Foods, Inc.*, No. C20-5476-JCC, 2021 WL 3616786, at *4 (W.D. Wash. Aug. 14, 2021).  *Bristol-Myers* held that in a mass tort action, the forum state lacked jurisdiction over claims of out-of-state plaintiffs who could not demonstrate a link between their claims and the forum.  582 U.S. at 264–65.  The Ninth Circuit has not yet weighed in on whether *Bristol-Myers* applies to FLSA collective actions but is considering that question in a case set for argument in February or March 2025, and other circuits have adopted this view.  (Dkt. No. 54 at 20, n.1, citing *Harrington v. Cracker Barrel Old Country Store Inc.*, Case No. 24-1979 (9th Cir.))  On reply, Plaintiff states that "[a]lthough Plaintiff disagrees with this result, Plaintiff acknowledges this Court is unlikely to adopt a different result until the Ninth Circuit provides further clarity on the issue."  (Dkt. No. 57 at 2, n.1.)  Because Plaintiff is not pressing the argument, the Court will assume, without deciding, that jurisdiction is limited to putative plaintiffs in Washington.  Should the Ninth Circuit ultimately hold that *Bristol-Myers* does not apply to the FLSA, the Parties can submit renewed motions and the Court will revisit the issue.

Two issues remain live for the Court to consider: certification of the meal-break plan collective, and terms of notice and distribution to putative plaintiffs.

b.  Certification of the Meal-Break Plan Collective

i.  *Legal Standard for Certification*

The Ninth Circuit extensively discussed the standard for certification of an FLSA collective action in *Campbell v. City of Los Angeles*, 903. F.3d 1090 (9th Cir. 2018).  The standard is *not* the same as that of class certification under Federal Rule of Civil Procedure 23.

*Id.* at 1101.  Courts typically follow a two-step certification process.  The first step, preliminary

certification is "conditioned on a preliminary determination that the collective as defined in the

complaint satisfies the 'similarly situated' requirement of section 216(b)."  *Id.* at 1109.  The

court's analysis is limited to the pleadings and supporting declarations.  *See id.*  At this stage,

"[t]he level of consideration is 'lenient'. . . loosely akin to a plausibility standard, commensurate

with the stage of the proceedings."  *Id.*  If preliminary certification is approved, notice is sent out

to putative collective action members, and discovery ensues.  *Id.*  At the second stage, after

discovery, the "employer can move for 'decertification' of the collective action for failure to

satisfy the 'similarly situated' requirement in light of the evidence produced to that point."  *Id.*

At that stage, "[t]he district court will then take a more exacting look at the plaintiffs' allegations

and the record"—akin to summary judgment.  *Id.*

    The "similarly situated" requirement is a lenient standard and is not as exacting as the

commonality requirement of Rule 23.  *See id.* at 1114–15.  In *Campbell*, the Ninth Circuit

surveyed majority and minority approaches to interpreting "similarly situated" and rejected both,

ultimately holding that "[p]arty plaintiffs are similarly situated, and may proceed in a collective,

to the extent they share a similar issue of law or fact material to the disposition of their FLSA

claims."  *Id.* at 1117.  The court cautioned against allowing distinctions between employees in

their employment circumstances to defeat certification.  Specifically, *Campbell* concerned a

group of Los Angeles Police Department officers who challenged an unwritten policy they

claimed deprived them of overtime pay, and the district court decertified the collective at the

second stage.  *Id.* at 1099.  The district court applied an incorrect standard, improperly

"emphasiz[ing] that Officers worked on different tasks, in different divisions, and under different

supervisors."  *Id.* at 1116.  That was erroneous because "[t]hose distinctions would not have

mattered to the determination of liability if it were proven, as claimed, that the Department had an overall policy against submitting small overtime claims. A systemic policy is no less common across the collective if those subject to it are affected at different times, at different places, in different ways, or to different degrees." *Id.* (internal citation omitted).  Rather, "those distinctions go to the individualized calculation of damages or the individualized application of defenses. Such distinctions do not preclude collective treatment for the purpose of resolving the common issue that *does* exist, and that must be answered in the first instance." *Id.*  As discussed below, similar considerations apply to the analysis here.

### ii.  Analysis

Applying the *Campbell* standard to the putative meal-break plan collective, the Court finds that conditional certification should be granted.  The Court starts by reviewing the evidence Plaintiff has put in the record.  Plaintiff has produced nine declarations from Sky Climber employees, the first two of whom worked on projects in Washington.  Plaintiff Olmedo worked on a Sky Climber site in Olympia, Washington (among others out-of-state) and earned approximately $22.00 per hour.  (Dkt. No. 53-1 at 3.)  Mr. Olmedo says that the requirement to log a thirty-minute meal break was reinforced at daily safety meetings, regardless of the site or supervisor.  (*Id.*)  As a matter of practice, however, he says that Sky Climber employees "rarely" took their meal or rest breaks.  (*Id.* at 4.)  "Once we climbed all the way up a turbine we typically sepnt the whole day up the turbine working. We even tried to avoid taking restroom breaks because it took so long to climb down the turbine . . . . Sometimes we might have snacks while working such as trail mix or other snacks we could keep in our pockets. Generally, we only took an actual meal break when we had to stop work due to inclement weather." (*Id.*)  Mr. Olmedo says he complained to management about the problem and they had actual knowledge of it.  (*Id.*)

At a site in Iowa, he asked his Site Manager if he had to record his meal break even though he did not take the break and the manager said yes: "My Site Manager told me it was company policy to record taking one every day and he could not approve my time records unless one was included, so I had to record taking one whether I took it or not." (*Id.* at 4–5.) Plaintiff's second declaration is from Derek DeVita, who worked at sites in Washington and elsewhere, and whose allegations are very similar (verbatim in some places) to those of Mr. Olmedo. (*See* Dkt. No. 53-2.) The subsequent seven declarations are likewise very similar, involving individuals who did not work in Washington, though they allege that Sky Climber employed the same practices at all of their locations.[1] For instance, declarant Sergio Castellanos states that "[a]t each location I worked at for Sky Climbers, the Site Managers at those locations also reiterated to me and my coworkers, that we had to deduct time from our pay for a meal break, regardless of whether we took a break or not." (Dkt. No. 53-4 at 5.) Another declarant, Joshua Gruwell, alleges that a Sky Climber supervisor edited his time sheet after submitting it, and Gruwell confronted him about it:

---

[1] While the Court will limit the putative collective to Washington-plaintiffs only, the Court considers the declarations of employees who worked outside Washington to the extent they are probative of a company-wide practice. Additionally, on December 6, 2024, Plaintiff filed notice withdrawing opt-ins for plaintiffs outside Washington, including some of those individuals who filed affidavits in support of the certification motion (Brown, Castellanos, Gruwell, Mijares, Roberts, Torres) (*compare* Dkt. No. 58 at 1–2 *with* Dkt. Nos. 53-4, 53-5, 53-6, 53-7, 53-8, 53-9). The Court is unclear what effect, if any, that action has on consideration of their affidavits. But were the Court to consider only the two affidavits concerning job sites in Washington, they would still be sufficient to certify the collective because they "set[] forth sufficient facts to show that there are similarly situated employees with regard to job requirements, job titles, hours of work and pay structures." *Lucke v. PPG Indus., Inc.*, No. 13CV0966, 2013 WL 6577772, at *4 (W.D. Pa. Dec. 16, 2013) (certifying collective based on one affidavit); *Aguayo v. Oldenkamp Trucking*, No. CV F 04-6279 ASI LJO, 2005 WL 2436477, at *4 (E.D. Cal. Oct. 3, 2005) (same); *AON Corp. Wage & Hour Emp. Pracs. Litig.*, No. 08 C 5802, 2010 WL 1433314, at *9 (N.D. Ill. Apr. 8, 2010) (same); *Iriarte v. Redwood Deli & Catering, Inc.*, No. CV-07-5062 FB(SMG), 2008 WL 2622929, at *3 (E.D.N.Y. June 30, 2008) (one affidavit plus interrogatory responses).

1

> If we did not record a 30-minute break for lunch, our Site Manager would edit our time after we submitted it to deduct thirty minutes. I know this was happening because I noticed my time was not adding up correctly after I submitted. When I questioned my Site Manager about my missing time, he explained Sky Climbers had to take out thirty-minutes for a meal break if we did not put one in ourselves. When I told my Site Manger that I never took a break, he told me it did not matter whether I took one or not and that I needed to deduct it myself when submitting time or they would have to do it for me.

(Dkt. No. 53-6 at 3–4.)  Declarants David Roberts and Joseph Torres similarly allege that timesheets were edited after submission.  (Dkt. Nos. 53-8 at 3–4; 53-9 at 3–4.)

In its response, Defendant provides extensive information about the different types of technicians Sky Climber employs, the different roles those technicians fulfill, and information about the components of wind turbines themselves.  While the Court appreciates that context, Defendant fails to explain its relevance to the certification inquiry.  For instance: some technicians work with both an on-site contact and a lead technician, others have only an on-site contact. (Dkt. No. 54 at 9.)  There are "access" technicians who install scaffolding and platforms so that others can work on the tower, and there are "composites" technicians who replace fiberglass, coatings, and resins on blades and other components.  (*Id.* at 10.)  Work might include power washing the turbine's exterior or replacing lighting-grounding cables in the interior.  (*Id.* at 10–11.)  Some technicians enter their time through a timecard, others with an app.  (*Id.* at 12–13.)  Some take their breaks "up-tower," others on the ground or in a vehicle.  (*Id.* at 14–16.)  Again, none of these distinctions have clear relevance to whether the employees are similarly situated with respect to an unwritten policy of preventing employees from taking unpaid meal breaks.

There are some distinctions Defendant identifies that may well be relevant to which employees are impacted by the alleged unwritten policy.  For instance, Defendant states that for one client, Vestas, on some projects—depending on the type of task, contractual payment

1    arrangement, or dates of service—Vestas approved timesheets rather than Sky Climber itself.

2    (*See id.* at 12.)  Also, in some cases, technicians may choose to have one technician record time

3    for the entire team.  (*Id.*)  Some technicians, the access and service technicians, have more

4    predictable work schedules and take breaks together.  (*Id.*)  Although these distinctions could be

5    relevant to understanding who is impacted by the meal break policy, the Court would be better

6    able to make that determination at the decertification stage, after discovery.  For instance, the

7    Court does not know at this stage how frequent it is that Vestas would handle timekeeping

8    functions for Sky Climber, or whether that distinction would make a difference to Sky Climber's

9    employees' ability to fully utilize their break time.  At the decertification stage, if appropriate,

10   the Court could narrow the scope of the collective based on the available evidence.  And even if

11   not all employees are impacted in the same way, that would not necessarily defeat certification.

12   As the Ninth Circuit stated, "[a] systemic policy is no less common across the collective if those

13   subject to it are affected at different times, at different places, in different ways, or to different

14   degrees."  *Campbell*, 903. F.3d at 1116. [2]

15        Defendant, with its response and supporting declarations, also disputes that an unwritten

16   policy against taking meal breaks exists and asserts that its meal break practices are compliant

17   with the FLSA.  (*See* Dkt. No. 54 at 13–14, 17–18.)  However, the information Defendant

18   presents goes to the merits, rather than to conditional certification.  To summarize: Sky

19   Climber's Vice President of Operations, Dustin Joffrion, asserts that if a technician is unable to

20   take their thirty-minute break "they are told and expected to add 30 minutes to their time at the

---

[2] Sky Climber further asserts that it uses state-specific meal break policies in some states, like
California and Illinois.  (*See* Dkt. No. 54-1 at 14.)  Because the Court is for now limiting the
scope of the putative class to employees who worked on sites in Washington (and no
Washington-specific policy is asserted), the Court does not consider the impact of those state-
variations at this time.

end of the day so that they are paid for the missed break." (Dkt. 54-1 at 13.)  If the technician is using Sky Climber's timekeeping system, then a Sky Climber supervisor will instruct the technician to do so, but if the technician is on a Vestas site and using Vestas' timekeeping system, a Vestas supervisor will instruct the technician to do so.  (*Id.*)  Technician Bobby Branch asserts that he is paid for an additional half hour of time if he is unable to take his lunch break.  (Dkt. No. 54-2 at 2).  Technician Drake Lombardi states that he always takes his lunch break, at a time decided on by the group.  (*See* Dkt. No. 54-3 at 3–4).  Technician Joel Macias states that it is not practical for individuals to take breaks at different times, because the whole team is needed for the work, and he tells trainees that the break period is mandatory.  (Dkt. No. 54-4 at 3.)  Technician Nick Clark states that if he told his supervisor that he did not take his break, he would be asked why, and then thirty minutes would be added to his timecard.  (Dkt. No. 54-6 at 4.)  Lead Technician Zach Nicotra likewise states that he would personally add these thirty minutes to timecards if a person or a team missed their break.  (Dkt. No. 54-7 at 2.)  These testimonies are probative of the ultimate merits, but at this stage, akin to a motion to dismiss, the Court is only determining whether Plaintiff has plausibly pled a claim, which he has.

This case is analogous to other collectives, cited by Plaintiff, that have been certified.  In *Chetwood v. T-Mobile USA, Inc.*, No. 19-CV-458-RSL, 2020 WL 1689730, at *2 (W.D. Wash. Apr. 7, 2020) the court certified a collective action for employees who alleged they were unpaid for time they spent logging into their computers and loading necessary programs, including rebooting and resyncing their computers after lunch breaks.  The court recognized that "Defendant may ultimately defeat plaintiffs' off-the-clock wages claim by demonstrating that it in fact paid its employees for all hours worked, or the scope of this FLSA collective action may be reduced by showing that the off-the-clock work did not occur in all of defendant's call

1   centers" but that determination would be left for the decertification stage, because plaintiff's

2   allegations were plausible. *Id.* at *3. In *Bolding v. Banner Bank*, No. C17-0601RSL, 2017 WL

3   6406136, at *2 (W.D. Wash. Dec. 15, 2017) the court certified a collective of mortgage brokers

4   who allegedly were required to assist customers outside of the 40-hour workweek and were

5   refused overtime for that work. Defendant argued that employees controlled their own time, that

6   the company enforced a policy against off-the-clock work, and that any properly calculated

7   overtime was paid. *Id.* But again, the court stated that those objections would go to the ultimate

8   merits or scope of the claim after discovery and certified the collective. *Id.*

9      Defendant argues this case is like *Dudley v. Texas Waste Systems*, 2005 WL 1140605

10  (W.D. Tex. 2005), where the court declined to conditionally certify a collective action of drivers

11  required to work through lunch breaks. The court commented that an inquiry of whether an

12  employee took their lunch break would necessarily be individualized, as would the compensation

13  owed to them. *Id.* at *2. But in that case, the court stated that plaintiff produced "no evidence"

14  refuting defendant's written policy requiring breaks and no evidence to refute defendant's

15  testimony that drivers had to inform the employer if they were working through their break. *Id.*

16  Here, Plaintiff has produced evidence of an unwritten policy against lunch breaks, and evidence

17  of employees making unsuccessful efforts to advise managers that they needed to be paid for

18  missed breaks, in the form of declarations. (*See e.g.*, Dkt. Nos. 53-1 at 4–5; 53-6 at 3–4.)

19  Moreover, to the extent the *Dudley* court required plaintiffs to affirmatively disprove defendant's

20  assertions at the conditional certification stage, that is not the governing standard in the Ninth

21  Circuit.

22      Defendant also cites cases that conditionally certified smaller collective action groups

23  than plaintiffs proposed. In *Harp v. Starline Tours of Hollywood, Inc.*, No.

24

214CV07704CASEX, 2015 WL 4589736, at *7 (C.D. Cal. July 27, 2015), a case concerning drivers on sightseeing tours working through lunch breaks, the court narrowed the proposed collective.  Plaintiffs sought to certify a collective of "[a]ll individuals who have been employed or are currently employed by the Defendants, or any of them, as hourly workers performing work relating to tours." *Id.* at *3.  The court limited the collective just to drivers, not to *all* hourly employees of the defendants, because plaintiff's evidence only related to drivers. *Id.* at *7.  For one defendant, EMH, whose involvement was limited to a particular joint-venture, the collective against EMH was limited just to its drivers involved in that venture. *Id.*  Here, Plaintiff asks the Court to certify a collective defined as "[a]ll hourly Sky Climber employees who were subject to Sky Climber's meal break policy and/or bonus pay scheme at any time in the past 3 years." (Dkt. No. 53-11 at 1–2.)  Defendant has not proposed any specific revisions that definition, such as specifying that the collective can only include technicians.  But because the proposed collective would include only those subject to the meal plan and bonus scheme polices—for which Plaintiff has submitted evidence—the Court finds that the collective is sufficiently defined (though it will need to be limited to Washington plaintiffs), and the same problems identified in *Harp* are not present here.

### c.  Notice Terms and Methods

Defendant raises several objections to Plaintiff's proposed notice and methods of distribution.  First, Defendant request an opportunity to meet and confer with Plaintiff about the notice.  (*See* Dkt. No. 54 at 31–32); *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989) (in ADEA collective action, "[b]oth the parties and the court benefit from settling disputes about the content of the notice before it is distributed.").  The Court will direct the parties to meet and confer to agree upon a stipulated notice, but to provide the Parties with

1    guidance and to facilitate expedient resolution, the Court will also rule on several issues that

2    were raised in the briefs.

3            Defendant objects to the statement "[t]he Court in this case has 'conditionally certified' a

4    collective action lawsuit that may affect you," reasoning that it "could be interpreted as the court

5    encouraging participation in this lawsuit, which is not proper." *Randall v. Integrated Commun.*

6    *Serv.*, No. C20-5438JLR, 2021 WL 2328373, at *7 (W.D. Wash. June 8, 2021); (Dkt. No. 54 at

7    32.)  But the proposed term disapproved in *Randall* was much more problematic: "the court has

8    conditionally determined that *you are 'similarly situated'* to the named Plaintiffs" (emphasis

9    added)—erroneously implying that the court had made some individualized determination about

10   an as yet-unidentified putative plaintiff.  By contrast, the statement that "the Court in this case

11   has 'conditionally certified' a collective action lawsuit that may affect you" merely states a fact

12   about the posture of the case and does not raise the same concerns.

13           Defendant also objects that the notice "does not contain sufficient language regarding

14   Sky Climber's belief it complied with the FLSA in good faith."  (Dkt. No. 54 at 32.)  Plaintiff

15   has offered to amend the notice to state: "Defendant denies Plaintiff's allegations as well as the

16   allegations of the individuals who have joined this Lawsuit. Defendant contends that Plaintiffs

17   and the Putative Collective Members have been, and continue to be, properly paid under the

18   FLSA." (Dkt. No. 57 at 9.)  The Court believes that this sufficiently states Defendant's position.

19           Defendant requests that the notice include some statement about the potential need for

20   putative plaintiffs to participate in discovery.  (Dkt. No. 54 at 32).  Defendant cites *Hamilton v.*

21   *NuWest Grp. Holdings, LLC*, No. C22-1117RSM, 2023 WL 3582939, at *3 (W.D. Wash. May

22   22, 2023), in which the court required the notice to inform plaintiffs that they may be "asked to

23   give testimony and information about your work for defendant."  Plaintiff objects due to the

24

1   potential chilling effect of such statements. (Dkt. No. 57 at 8–9, citing *Hunter v. Legacy Health*,

2   No. 3:18-CV-02219-AC, 2021 WL 24553, at *8 (D. Or. Jan. 4, 2021) ("the court will not require

3   the notice to include a warning about potential discovery or attorney fee obligations."). In

4   *Randall*, the court disapproved of notice that would have informed plaintiffs of the potential need

5   to "provide documents, travel to the Western District of Washington to be deposed or testify at

6   trial, and pay attorneys' fees and costs if they do not prevail" for fear of the chilling effect. 2021

7   WL 2328373 at *4. Instead, the court accepted the formulation that plaintiffs "may be required,

8   with the assistance of the Plaintiffs' lawyers, to respond to written questions, sit for depositions,

9   and/or testify in court." *Id.* Here, the Court agrees with Defendant that there should be *some*

10  mention of discovery obligations but agrees with Plaintiff that statements implying excessive

11  costs or daunting obligations must be avoided. The statement approved in *Hamilton* that a

12  plaintiff may be "asked to give testimony and information about your work for defendant" is

13  sufficiently informative without causing undue chill. The Parties may decide the exact wording.

14          Next, Defendant requests that opt-in notices be sent to the Court rather than to Plaintiff's

15  counsel. (Dkt. No. 54 at 33, citing *Bowens v. Atl. Maint. Corp.*, 546 F. Supp.2d 55, 85 (E.D.N.Y.

16  2008).) The Court rejects this suggestion because it would inundate the Clerk of Court's staff

17  with work that should be handled by the Parties. Opt-ins are to be returned to Plaintiff's counsel.

18          Defendant asks that Plaintiff be prohibited from sending text messages to potential

19  plaintiffs because it would be an "unnecessary invasion of privacy." *Hamilton*, 2023 WL

20  3582939, at *3; (Dkt. No. 54 at 33.) Plaintiff responds with several cases in which notice by text

21  message was permitted. (Dkt. No. 57 at 10.) The Court agrees with Plaintiff that text messaging

22  is an important method of communication, especially to reach those who do not read paper mail

23  or email. Text messaging is permitted, provided that the text messages are not sent so frequently

24

and excessively that they become harassing.  Further, Defendant requests that electronic

signatures should only be allowed if they can be audited and verified, by using a program such as

DocuSign.  (Dkt. No. 54 at 33.)  Plaintiff does not respond on that point specifically.  Use of

DocuSign or a similar product does not sound inherently unreasonable to the Court, to the extent

it is compatible with notice by text message or email and does not create unnecessary obstacles.

The Parties should discuss these specifics at their meet and confer.


## IV    CONCLUSION

Plaintiff's motion to Conditionally Certify a Collective Action (Dkt. No. 53) is

GRANTED.  The Parties are directed to meet and confer and to submit final terms of notice

consistent with this opinion, not more than fourteen (14) days from issuance of this order.

The Clerk is instructed to calendar this event.

Dated this 9th day of December, 2024.


David G. Estudillo
United States District Judge

ORDER GRANTING MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION (DKT. NO. 53) - 15